have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Note

Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. Adams v United States ex rel. McCann, 317 US 269, 275, 276, 87 L Ed 268, 63 S Ct 236, 143 ALR 435 (1942); see Powell v Alabama, supra, at 68–69, 77 L Ed 158, 53 S Ct 55, 84 ALR 527.

[4] Because of the vital importance of counsel's assistance, this Court has held that, with certain exceptions, a person accused of a federal or state crime has the right to have counsel appointed if retained counsel cannot be obtained. See Argersinger v Hamlin, 407 US 25, 32 L Ed 2d 530, 92 S Ct 2006 (1972); Gideon v Wainwright, supra; Johnson v Zerbst, supra. That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

[466 US 686]

[5–7] For that reason, the Court has recognized that "the right to counsel is the right to the effective assistance of counsel." McMann v Richardson, 397 US 759, 771, n 14, 25 L Ed 2d 763, 90 S Ct 1441 (1970). Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. See, e.g., Geders v United States, 425 US 80, 47 L Ed 2d 592, 96 S Ct 1330 (1976) (bar on attorney-client consultation during overnight recess); Herring v New York, 422 US 853, 45 L Ed 2d 593, 95 S Ct 2550 (1975) (bar on summation at bench trial); Brooks v Tennessee, 406 US 605, 612–613, 32 L Ed 2d 358, 92 S Ct 1891 (1972) (requirement that defendant be first defense witness); Ferguson v Georgia, 365 US 570, 593–596, 5 L Ed 2d 783, 81 S Ct 756 (1961) (bar on direct examination of defendant). Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render "adequate legal assistance," Cuyler v Sullivan, 446 US, at 344, 64 L Ed 2d 333, 100 S Ct 1708. Id., at 345–350, 64 L Ed 2d 333, 100 S Ct 1708 (actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective).

[8] The Court has not elaborated on the meaning of the constitutional requirement of effective assistance in the latter class of cases—that is, those presenting claims of "actual ineffectiveness." In giving meaning to the requirement, however, we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial





process that the trial cannot be relied on as having produced a just result.

[9] The same principle applies to a capital sentencing proceeding such as that provided by Florida law. We need not consider the role of counsel in an ordinary sentencing, which may involve informal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance. A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, see Barclay

[466 US 687]

v Florida, 463 US 939, 952-954, 77 L Ed 2d 1134, 103 S Ct 3418 (1983); Bullington v Missouri, 451 US 430, 68 L Ed 2d 270, 101 S Ct 1852 (1981), that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision. For purposes of describing counsel's duties, therefore, Florida's capital sentencing proceeding need not be distinguished from an ordinary trial.

## III

[10] A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

### A

[11] As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. See Trapnell v United States, 725 F2d, at 151–152. The Court indirectly recognized as much when it stated in McMann v Richardson, supra, at 770, 771, 25 L Ed 2d 763, 90 S Ct 1441, that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not "a reasonably competent attorney" and the advice was not "within the range of competence demanded of attorneys in criminal cases." See also Cuyler v Sullivan, supra, at 344, 64 L Ed 2d 333, 100 S Ct 1708. When a convicted defendant

[466 US 688]

complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See Michel v Louisiana, 350 US 91, 100–101, 100 L Ed

for which they become entitled to the greater disability benefits payable under § 2324 as amended.

Employer, Chrysler Corporation, appeals Superior Court's construction of the amended statute and ruling that the amount of disability benefits payable to Sforza and Johnson is determined as of their most recent date of return to total disability status rather than being fixed as of the date of their pre-July 1, 1975 injuries from which such disability arose.

The employees cross-appeal from the Superior Court's refusal to rule on their further contention that the increased statutory benefits are also payable to all persons injured and totally disabled thereafter—i. e., persons who have never resumed employment and thereafter returned to total disability status.

The controlling facts in this appeal are the same as those which were before us in *E. I. du Pont de Nemours & Co. v. Green*, 411 A.2d 953 (1980) and the questions presented in both the appeal and the cross-appeal are identical to those raised in *Du Pont v. Green.*

[1, 2] For the reasons stated in *Du Pont v. Green*, we hold that the claimants-appellees are not entitled to the increased statutory benefits payable under 19 *Del.C.* § 2324 as amended effective July 1, 1975 by reason of their return to total disability status after said date. *A fortiori*, claims by persons who remain continuously disabled after July 1, 1975 from previous injuries are likewise barred, as we also held in *Du Pont v. Green.* Hence, the cross-appeal must also fail.

Therefore, we reverse the decision of the Superior Court and reinstate the decision of the Industrial Accident Board.

REVERSED as to appeal; AFFIRMED as to cross-appeal.



**Jimmy JOHNSON, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 79-287.**

District of Columbia Court of Appeals.

Argued Nov. 14, 1979.

Decided March 14, 1980.

After defendant was convicted of crime and while his appeal was pending he moved for new trial, alleging ineffective assistance of counsel. Denial of relief was reversed in part and remanded, 385 A.2d 742 but, after hearing, the Superior Court, Tim Murphy, J., again denied relief, and an appeal was again taken. The District of Columbia Court of Appeals, Newman, C. J., held that: (1) trial counsel was grossly incompetent in trial preparation by failing to investigate favorable medical report, to seek to obtain copy of report and to secure and present testimony of doctor himself, who examined complainant after alleged offense and concluded that there was no evidence of trauma, and (2) such failure of trial counsel blotted out essence of substantial defense and deprived defendant of effective assistance of counsel though counsel attempted to present medical report's negative findings indirectly in his closing argument by arguing that Government's failure to produce results of medical examination allowed inference that evidence would have been favorable to defendant.

Reversed and remanded for new trial.

**1. Criminal Law ⚩641.13(1)**

Defendant's Sixth Amendment right to effective assistance of counsel is violated if there has been gross incompetence of counsel and if this has in effect blotted out essence of substantial defense. U.S.C.A. Const. Amend. 6.

**2. Criminal Law ⚩641.13(6)**

In prosecution for taking indecent liberties with and enticing minor child, trial counsel was grossly incompetent in trial preparation by failing to investigate favorable medical report, to seek to obtain copy of report and to secure and present testimony of doctor himself, who examined complainant after alleged offense and concluded that there was no evidence of trauma. D.C.C.E. § 22-3501(a, b); D.C.C.E. SCR, Criminal Rule 16(a)(1)(D). U.S.C.A.Const. Amend. 6.

**3. Criminal Law ⚩641.13(6)**

Pretrial preparation is susceptible to reasonably objective determinations, and failure to investigate is one such objective violation of attorney's duty to client, and proper investigation is particularly crucial where central issue is question of credibility between key government witness and defendant. U.S.C.A.Const. Amend. 6.

**4. Criminal Law ⚩641.13(1)**

To establish ineffective assistance of counsel, defendant was required to show such prejudice from gross incompetence that substantial defense was blotted out, and showing required defendant to meet heavy burden of proving prejudice. U.S.C. A.Const. Amend. 6.

**5. Criminal Law ⚩641.13(6)**

In prosecution for taking indecent liberties with and enticing minor child, failure of trial counsel to investigate favorable medical report and to seek to obtain copy of report and to secure and present testimony of doctor himself blotted out essence of substantial defense and deprived defendant of effective assistance of counsel though counsel attempted to present medical report's negative findings indirectly in his closing argument by arguing that Government's failure to produce results of medical examination allowed inference that evidence would have been favorable to defendant. D.C.C.E. § 22-3501(a, b); D.C.C.E. SCR, Criminal Rule 16(a)(1)(D); U.S.C.A. Const. Amend. 6.

**6. Criminal Law ⚩641.13(1)**

A "substantial defense" from standpoint of whether defendant had been deprived of effective assistance of counsel by

where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218. Later cases have explained that a prosecutor's duty to disclose such evidence applies even in the absence of a request by the accused. Moreover, the prosecution's duty to disclose such evidence can encompass impeachment material as well as purely exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 351-52 (1976).

[20] To meet the standard of "materiality" and establish a *Brady* violation, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. Our previous decisions, however, have adopted a deliberate suppression standard that provides even greater protection to criminal defendants than the one articulated in *Bagley*. *See State v. Wyche*, 518 A.2d 907, 910 (R.I.1986); *In re Ouimette*, 115 R.I. 169, 177, 342 A.2d 250, 254 (1975). In *Wyche*, we explained:

> "When the failure to disclose is deliberate, this court will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; we shall simply grant the defendant a new trial. *Id.* *The prosecution acts deliberately when it makes 'a considered decision to suppress * * * for the purpose of obstructing' or where it fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.* ' " *Wyche*, 518 A.2d at 910 (quoting *United States v. Keogh*, 391 F.2d 138, 146-47 (2d Cir.1968)). (Emphasis added.)

We also explained in that case, however, that the *Brady* doctrine has its limits and does not "extend an open invitation to criminal defendants to comb prosecution files for any or all information that might be remotely useful." *Wyche*, 518 A.2d at 908 (citing *Agurs*, 427 U.S. at 111, 96 S.Ct. at 2401, 49 L.Ed.2d at 354). Thus, the nondisclosed information still must be material in the sense that its "high value to the defense could not have escaped * * * [the prosecution's] attention." *Id.*, at 910.

Applying the *Wyche* doctrine to the circumstances in this case, we hold that defendant failed to establish a *Brady* violation here. First, the parties' concurrent Family Court divorce action involved the same parties as the case at bar. That action spawned substantial discovery and resulted in the production of many if not all of the very medical and psychological records concerning Mrs. Cronan that defendant claimed were not provided to him in the criminal case. The defendant, through his Family Court trial counsel, had access to all the sealed medical and psychological records that were produced in the Family Court action. (FN16) Indeed, defendant ***881** introduced several of them into evidence in the divorce case, and his gleanings from those records now form the basis of his *Brady* urgings here. (FN17) We decline to read the prosecution's *Brady* obligation so formalistically as to require the prosecution to deliver to a defendant all the same documentary information and material that both sides knew was already produced or otherwise available to them as a result of the concurrent divorce proceedings in the Family Court. Given these circumstances, no record support exists for the suggestion that the prosecution made " 'a considered decision to suppress * * * for the purpose of obstructing' " any evidence that was favorable to defendant's case. *Wyche*, 518 A.2d at 910. *See United States v. Earnest*, 129 F.3d 906, 910 (7th Cir.1997) ("[E]vidence is not regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence.").

Furthermore, through the divorce proceeding and other means, including defendant's knowledge of his wife's mental-health problems and her treatments for them, the defense knew about the alleged "high value" of the medical and other evidence documenting this situation well before the criminal trial started. Nevertheless, the defense either failed or consciously decided not to use or to obtain access to all that evidence or to subpoena certain medical records or other alleged impeachment material that it now concludes would have undercut the prosecution's case. *Cf. United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir.2000) ("Even if evidence is material and exculpatory, it 'is not "suppressed" ' by the government within the meaning of *Brady* 'if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.' ") (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993); and *United States v. LeRoy*, 687 F.2d 610, 618 (2d

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Case 1:08-cv-00082-ML-JH Document 11-2 Filed 07/24/2008 Page 4 of 7



STATE

v.

Christine M. WEBBER.

No. 97-116-C.A.

Supreme Court of Rhode Island.

July 24, 1998.

Defendant was convicted in the Superior Court, Providence County, Rodgers, President Judge, of first-degree arson. Defendant appealed. The Supreme Court, Goldberg, J., held that: (1) State did not lay adequate foundation for admission of expert testimony about arson detecting dog's activities; (2) testimony concerning defendant's emotional outburst upon witnessing dog's alert to alleged detection of accelerants on defendant's car mat was inadmissible; and (3) testimony that dog "was more sensitive than the gas chromatograph" constituted impermissible bolstering of testimony concerning dog's alert.

Judgment vacated and remanded.

1. Criminal Law ⇐1043(1)

Issue concerning propriety of expert testimony about arson detecting dog's activities was properly preserved for appellate review; although defense counsel raised no objection to testimony concerning dog's alerts inside the burned dwelling, counsel made lengthy and vigorous argument against admissibility of any testimony concerning dog's alert in defendant's automobile. Rules of Evid., Rule 702.

2. Criminal Law ⇐469.1

Even though expert testimony may be helpful to the trier of fact, a foundation is still required for it to be admissible. Rules of Evid., Rule 702.

3. Criminal Law ⇐476.2, 478(1)

State did not lay adequate foundation for admission of expert testimony about arson detecting dog's activities; State failed to establish expertise of dog's curator, dog's background and training, and dog's general accuracy during investigations. Rules of Evid., Rule 702.

4. Criminal Law ⇐338(7)

Fire investigator's testimony concerning arson defendant's emotional outburst upon witnessing arson detecting dog's alert to alleged detection of accelerants on defendant's car mat was inadmissible under rule on exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time; although State sought to introduce testimony to demonstrate defendant's state of mind, testimony had effect of establishing fact that flammable accelerant was present on driver's floor mat and, furthermore, that defendant was responsible for its presence. Rules of Evid., Rule 403.

5. Criminal Law ⇐1159.4(2)

Determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury.

6. Criminal Law ⇐449.1

Witnesses ⇐318

Witness is not permitted to offer an opinion regarding the truthfulness or accuracy of another witness' testimony, even when the opinion does not literally address the other witness' credibility; if the opinion testimony has the same "substantive import" and bolsters another witness' credibility, it is inadmissible.

7. Witnesses ⇐318

Fire marshal's testimony that arson detecting dog "was more sensitive than the gas chromatograph" constituted impermissible bolstering of fire investigator's testimony concerning dog's alert and thereby encroached upon jury's exclusive territory of determining witness' credibility.

---

Annie Goldberg, Aaron L. Weisman, Kathleen M. Hagerty, Providence, for plaintiff.

David N. Cicilline, Bristol, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

was for sexual-abuse recovery. For example, the following exchanges took place:

"Q. Directing your attention to your private practice, has your private practice focused on any particularized area of concern in counseling?

"Defense counsel: I object.

"The court: What was your objection?

"Defense counsel: No foundation at this point.

"The court: Objection overruled.

"A. I have worked primarily with people who have been abused either physically, sexually or emotionally due to dysfunctional family situations.

"* * *

"Q. You said earlier that your practice focuses primarily on abuse either sexual, physical or emotional?

"A. That's correct.

"Q. Is it for one of those things or something else that you counsel [Amy]?

"Defense counsel: Objection.

"The court: What's your objection?

"Defense counsel: It's leading, there is no foundation.

"The court: Objection overruled, she may respond.

"A. Yes, she was referred to me for sexual abuse recovery counseling.

"Q. Sexual abuse recovery counseling, is that what you said?

"A. Yes.

"* * *

"Q. I do understand she was referred to [you] by DC[Y]F, and you have been counseling her for sexual abuse recovery, is that what you testified to?

"A. Yes.

"Q. Has that been the focus of your counseling throughout the period of February '91 through May of '93?

"A. Yes, it has with all of its ramifications."

[1] Swink's first knowledge of and contact with Amy occurred in February 1991, approximately six months after the last incident of sexual abuse allegedly occurred. The defendant claims that because Swink had no firsthand knowledge that Amy had been sexually molested, her testimony that she counseled Amy for sexual-abuse recovery constituted impermissible vouching for the credibility of the complaining witness. We agree.[2]

Note:

[2–4] The determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury. *State v. James,* 557 A.2d 471, 473 (R.I.1989); *State v. Desmarais,* 479 A.2d 745, 748 (R.I.1984); *State v. Castore,* 435 A.2d 321, 326 (R.I.1981). Because credibility determinations are solely a jury function, a witness is not permitted to offer an opinion concerning the truthfulness of the testimony of another witness. *James,* 557 A.2d at 473; *see also State v. Tavares,* 590 A.2d 867, 870–71 (R.I.1991); *State v. Nicoletti,* 471 A.2d 613, 617 (R.I.1984). Even when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same "substantive import," such testimony is inadmissible. *See Tavares,* 590 A.2d at 870–71 (citing *Commonwealth v. Montanino,* 409 Mass. 500, 567 N.E.2d 1212 (1991)).

See testimony of Paula McLeish Trial Transcripts page 179

In *Montanino* a male defendant was found guilty on two counts of engaging in unnatural sexual intercourse with a fifteen-year-old male. The victim did not report the incidents until four years after they had occurred. At trial the victim made several statements that were inconsistent with his original report to the police. On redirect examination, the prosecutor asked the police officer who had taken the report, "And, would you tell us, Sergeant, whether or not you have an opinion as to whether in your initial discussions with victims, [you] tend to get more or less than the complete details that you eventually learn regarding the incident?" 409 Mass. at 502, 567 N.E.2d at 1213. The officer responded that in his experience interviewing sexual-assault victims, "'most' victims eventually provided more details regarding the assault than they initially revealed." *Id.* at 502–03, 567 N.E.2d at 1213.

2. The defendant claims that two other witnesses also impermissibly vouched for Amy's credibility. We disagree with defendant's contention with respect to these two witnesses.

Case 1:08-cv-00082-ML-JH Document 11-2 Filed 07/24/2008 Page 6 of 7



contending parties to submit all matters in dispute, *alto et basso*, to arbitration.

**Altum mare** /ǽltəm mǽriy/. L. Lat. In old English law, the high sea, or seas. The deep sea. *Super altum mare*, on the high seas.

**A lui et a ses heritiers pour toujours** /a lwíy ey a séyz eriytyéy pur tuwzhúr/. To him and to his heirs forever.

**Alveus** /ǽlviyəs/. The bed or channel through which the stream flows when it runs within its ordinary channel. *Alveus derelictus*, a deserted channel.

**A.M.** *Ante meridiem*, before noon. Only the abbreviation is ordinarily used. Also *artium magister*, master of arts. Also *annus mirabilis*, the wonderful year—1666, the year of the defeat of the Dutch fleet and of the great London fire. Also *anno mundi*, in the year of the world; that is, when the creation of the world is said to have taken place, 4004 B. C.

**A.M.A.** American Medical Association.

**A ma intent** /a ma æntón/. On my action.

**Amalgamation** /əmǽlgəméyshən/. Union of different races, or diverse elements, societies, unions, associations, or corporations, so as to form a homogeneous whole or new body; interfusion; intermarriage; consolidation; merger; coalescence; as, the amalgamation of stock.

**Amalphitan code** *or* **table** /əmǽlfədən kowd/°téybəl/. A collection of sea-laws, compiled about the end of the eleventh century, by the people of Amalphi. It consists of the laws on maritime subjects, which were or had been in force in countries bordering on the Mediterranean; and was for a long time received as authority in those countries. It became a part of the law of the sea. *See* Code.

**A manibus** /èy mǽnibəs/. Lat. Royal scribe. *See* Amanuensis.

**Amanuensis** /əmǽnyuwénsəs/. One who writes on behalf of another that which he dictates.

**A manu servus** /èy mǽ(y)uw sərvəs/. Lat. A handservant; a scribe; a secretary.

**Ambactus** /æ̀mbǽktəs/. A messenger; a servant sent about; one whose services his master hired out.

**Ambasciator** /æmbæ̀shiyéytər/. A person sent about in the service of another; a person sent on a service. A word of frequent occurrence in the writers of the middle ages.

**Ambassador.** A public officer clothed with high diplomatic powers, commissioned by a government to transact the international business of his government with a foreign government.

An Ambassador of the United States is the personal representative of the President and reports to the President through the Secretary of State. Ambassadors have full responsibility for implementing the U.S. foreign policy by any and all U.S. Government personnel within their country of assignment, except those under military commands. Their responsibilities include negotiating agreements between the United States and the host country, explaining and disseminating official U.S. policy, and maintaining cordial relations with that country's government and people. 22 U.S.C.A. § 3942.

A distinction was formerly made between Ambassadors *Extraordinary*, who were sent to conduct special business or to remain for an indeterminate period, and Ambassadors *Ordinary*, who were sent on permanent missions; but this distinction is no longer observed. *See also* Diplomatic agent.

**Ambidexter** /æ̀mbədékstər/. Skillful with both hands; one who plays on both sides. Applied anciently to an attorney who took pay from both sides, and subsequently to a juror guilty of the same offense.

**Ambigua responsio contra proferentem est accipienda** /æmbígyuwə rəspónsh(iy)ow kóntrə pròfəréntəm ést əksipiyéndə/. An ambiguous answer is to be taken against (is not to be construed in favor of) him who offers it.

**Ambiguis casibus semper præsumitur pro rege** /æmbígyuwəs kéyzəbəs sémpər prəz(y)úwmətər pròw ríyjiy/. In doubtful cases, the presumption always is in behalf of the crown.

**Ambiguitas** /æ̀mbəgyúwətæ̀s/. Lat. From *ambiguus*, doubtful, uncertain, obscure. Ambiguity; uncertainty of meaning.

*Ambiguitas latens*, a latent ambiguity; *ambiguitas patens*, a patent ambiguity. *See* Ambiguity.

**Ambiguitas contra stipulatorem est** /æ̀mbəgyúwətæ̀s kóntrə stìpyəleytórəm ést/. Doubtful words will be construed most strongly against the party using them.

**Ambiguitas verborum latens verificatione suppletur; nam quod ex facto oritur ambiguum verificatione facti tollitur** /æ̀mbəgyúwətæ̀s vərbórəm lèytənz vèhrəfəkèyshiyówniy səplíytər, næ̀m kwód èks fǽkt(y)uw óhrətər æmbígyuwəm vèhrəfəkèyshiyówniy fǽktay tólətər/. A latent ambiguity in the language may be removed by evidence; for whatever ambiguity arises from an extrinsic fact may be explained by extrinsic evidence. Said to be "an unprofitable subtlety; inadequate and uninstructive."

**Ambiguitas verborum patens nulla verificatione excluditur** /æ̀mbəgyúwətæ̀s vərbórəm péytènz nálə vèhrəfəkèyshiyówniy eksklúwdətər/. A patent ambiguity cannot be cleared up by extrinsic evidence (or is never holpen by averment).

**Ambiguity** /æ̀mbəgyúwətiy/. Doubtfulness; doubleness of meaning. Duplicity, indistinctness, or uncertainty of meaning of an expression used in a written instrument. Want of clearness or definiteness; difficult to comprehend or distinguish; of doubtful import. For Extrinsic ambiguity, see that title.

Ambiguity exists if reasonable persons can find different meanings in a statute, document, etc., Laskaris v. City of Wisconsin Dells, Inc., App., 389 N.W.2d 67, 70, 131 Wis.2d 525; when good arguments can be made for either of two contrary positions as to a meaning of a

Con't next page

term in a document, Atlas Ready-Mix of Minot, Inc. v. White Properties, Inc., N.D., 306 N.W.2d 212, 220; when application of pertinent rules of interpretation to an instrument as a whole fails to make certain which one of two or more meanings is conveyed by the words employed by the parties, Wood v. Hatcher, 199 Kan. 238, 428 P.2d 799, 803.

Language in contract is "ambiguous" when it is reasonably capable of being understood in more than one sense. City of Sioux Falls v. Henry Carlson Co., Inc., S.D., 258 N.W.2d 676, 679. Test for determining whether a contract is "ambiguous" is whether reasonable persons would find the contract subject to more than one interpretation. Tastee-Freez Leasing Corp. v. Milwid, Ind.App., 365 N.E.2d 1388, 1390.

Ambiguity of language is to be distinguished from unintelligibility and inaccuracy, for words cannot be said to be ambiguous unless their signification seems doubtful and uncertain to persons of competent skill and knowledge to understand them. It does not include uncertainty arising from the use of peculiar words, or of common words in a peculiar sense. It is *latent* where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings, as where a description apparently plain and unambiguous is shown to fit different pieces of property. Logue v. Von Almen, 379 Ill. 208, 40 N.E.2d 73, 82. A *patent* ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used.

**Ambiguity upon the factum.** An ambiguity in relation to the very foundation of the instrument itself, as distinguished from an ambiguity in regard to the construction of its terms. The term is applied, for instance, to a doubt as to whether a testator meant a particular clause to be a part of the will, or whether it was introduced with his knowledge, or whether a codicil was meant to republish a former will, or whether the residuary clause was accidentally omitted.

**Ambiguous.** *See* Ambiguity.

**Ambiguum pactum contra venditorem interpretandum est** /æmbígyuwəm pǽktəm kóntrə vèndətórəm intərprətǽndəm ést/. An ambiguous contract is to be interpreted against the seller.

**Ambiguum placitum interpretari debet contra proferentem** /æmbígyuwəm plǽsətəm intərprətéray débət kóntrə pròfəréntəm/. An ambiguous plea ought to be interpreted against the party pleading it.

**Ambit.** A boundary line, as going around a place; an exterior or inclosing line or limit. The limits or circumference of a power or jurisdiction; the line circumscribing any subject-matter.

**Ambitus** /ǽmbətəs/. The procuring of a public office by money or gifts; the unlawful buying and selling of a public office.

**Amblotic** /æmblótək/. Having the power to cause abortion; anything used to produce abortion.

**Ambulance chaser.** A popular name for one who solicits negligence cases for an attorney for a fee or in consideration of a percentage of the recovery. Also, a term descriptive of the practice of some attorneys, on hearing of a personal injury which may have been caused by the negligence or wrongful act of another, of at once seeking out the injured person with a view to securing authority to bring action on account of the injury. Laymen's acquainting themselves with occurrence of accidents and approaching injured persons or their representatives with a view toward soliciting employment for an attorney in the litigation arising from the accident. *See also* Runner.

**Ambulatoria est voluntas defuncti usque ad vitæ supremum exitum** /æmbyələtóriyə èst volə́ntæs dəfə́ŋktay ə́skwiy æ̀d váytiy s(y)əpríyməm égzítəm/. The will of a deceased person was ambulatory until the latest moment of life.

**Ambulatory.** Lat. *ambulare,* to walk about. Movable; revocable; subject to change; capable of alteration.

*Ambulatoria voluntas* (a changeable will) denotes the power which a testator possesses of altering his will during his life-time.

*Courts.* The court of king's bench in England was formerly called an ambulatory court, because it followed the king's person, and was held sometimes in one place and sometimes in another. So, in France, the supreme court or parliament was originally ambulatory. 3 Bl. Comm. 38, 39, 41.

**Ambulatory disposition.** A judgment, decree, or sentence which is subject to change, amendment or revocation.

**Ambush.** To lie in wait, to surprise, to place in ambush.

**A me** /èy míy/. Lat. *ego,* I. A term in feudal grants denoting direct tenure of the superior lord. Unjustly detaining from me. He is said to withhold *a me* (from me) who has obtained possession of my property unjustly. To pay *a me,* is to pay from my money.

**Ameliorating waste** /əmíyl(i)yəreytiŋ wéyst/. An act of lessee, though technically constituting waste, yet in fact resulting in improving instead of doing injury to land. Generally, equity will not enjoin such waste.

**Ameliorations** /əmiyl(i)yəréyshənz/. Betterments; improvements.

**Amenable** /əmíynəbəl/°mén°/. Subject to answer to the law; accountable; responsible; liable to punishment.

Also means tractable, that may be easily led or governed; formerly applied to a wife who was governable by her husband.

**Amend.** To improve. To change for the better by removing defects or faults. To change, correct, revise. Texas Co. v. Fort, 168 Tenn. 679, 80 S.W.2d 658, 660. *See* Amendment.